————o————

No. 3663.

(Court of Appeal, Parish of Orleans.)

ARTHUR J. THOMPSON vs. S. PFEIFER & CO.

Appeal from Civil District Court, Division "C."

Saunders & Gurley, for Plaintiff and Appellee.

A. H. Wilson, for Defendant and Appellant.

1. Where in a contract for the sale of goods to be shipped to the purchaser by a date stipulated no mention is made of the date of delivery, good faith and fair dealing and the interest of commerce alike unite in requiring that he who stipulates to make the shipment by a certain date should see to it that, at least by no fault of his own, there is no unusual and unnecessary delay in the delivery.

2. Where the seller claims to have made the shipment within the period stipulated and an unusual delay has ensued in the delivery, the onus is on him to show that the delay is not attributable to him.

MOORE, J. Plaintiffs sued the defendants for $420.32, the difference between the contract price of 200 bags of beans and the price for which they were subsequently sold by the plaintiffs after defendants had declined to pay the price and accept delivery.

From a judgment in favor of the plaintiffs for the amount sued for, defendants appeal.

The controversy grows out of the following contract:

"Chicago, August 23rd, 1901.

"Sold to S. Pfeifer, New Orleans, La., for Arthur J. Thomp-

327

son & Co., Chicago, Ill., 200 bags choice hand-picked beans of the crop of 1901, at $2.60 per bushel, delivered, New Orleans. Shipment not later than September 17th, 1901. Terms: Net cash sight draft against bill of lading to be held for arrival and examination of goods.

"*Buyer*—S. Pfeifer & Co.,
"Lavelle.

"*Seller*—Arthur J. Thompson & Co."

As will be perceived, the contract fixes no time limit of delivery and is silent as to the point whence the shipment is to be made. The evidence, however, is that the purpose of the defendants in making the contract with a Chicago house was, forasmuch as beans were then scarce in the New Orleans market they could get quick delivery by ordering them from Chicago; and it is also shown that, under the custom of the trade, where the contract is silent as to the shipping point the shipment may be made from any point the seller may select. As will be shown hereafter the sellers selected East St. Louis as the point whence the shipment was to be made to defendants.

From the moment of the execution of the contract, *supra*, not a word was vouchsafed the defendants by the plaintiffs of any movement or effort on their part to carry out their engagement until, when on the 8th day of October, 1901, twenty-one days after the stipulated period of shipment, the defendants were presented by a New Orleans Bank with a sight draft drawn on them by the defendants for $1432.29, dated Chicago, Sept. 14th, 1901, with a bill of lading attached for 200 bags of beans, issued by the St. Louis Iron Mountain & Southern Railroad Company at East St. Louis, showing shipment to be from that point with the plaintiffs as consignors and the defendants as consignees, and bearing date February 14th, 1901. When this draft and bill of lading was presented to the defendants it took but a glance for them to discover that the date of the bill of lading had been altered and that its original date was October 3rd, 1901, which

was but clumsily erased. This latter date being beyond the shipping period agreed on, defendants refused to honor the draft; and, when four days later, the car of beans arrived, they refused to receive same. After due tender the plaintiffs had the beans sold with the loss as above stated.

The substitution of the date September 14th "for October 3rd" is not only apparent on the face of the bill of lading but it is established by plaintiff's own witness, the Commercial Agent of the St. L. I. M. & S. R. R. Co., stationed at Chicago, that the change was made; but by whom, neither he nor the plaintiffs who testified in the cause, advise us. The Agent testifies that the shipment at East St. Louis was received by his road on October 3rd, and that that is the true date which the bill of lading should, and did originally bear. Neither have the plaintiffs explained why, if any shipment of beans to defendants was made by them on the 14th of September, on which day they would have been authorized to draw their draft, the draft which they did draw and which they dated September 14th reached New Orleans only on the day it was presented to defendants, October 8th. However may be the delays which sometimes attend the delivery of goods, surely this delay in the reception of mails between Chicago and New Orleans is unusual. These two unusual and unexplained circumstances become among others suspicious factors in the case when we come to consider that plaintiff's contention is that the shipment of beans to defendant did, in point of fact, commence on the 14th of September, and that this starting point was at Brighton in the State of Michigan. This contention has not been sustained by the record. True it is that on the 11th of September, according to the testimony of one witness, and on the 14th of September, according to that of another witness, a shipment of 200 sacks of beans was made by one G. W. Galloway at Brighton Michigan to the plaintiff, consigned to the order of plaintiffs at East St. Louis "with the right of stoppage and inspection at Chicago."

The shipment was made over the Pere Marquette Railway in.

car 398 of that Company. Immediately the shipment was made Galloway drew his sight draft, with bill of lading for the price, on plaintiffs at Chicago.

Evidently the sight draft was paid, as Galloway says it was not returned to him, adding however that he was to remain the owner of the beans until the draft was paid. But as to the date when the draft was paid and as to the date when the shipment reached Chicago and was forwarded from that point, the record is silent. It may not be disputed until plaintiffs accepted the consignment from Galloway and honored the sight draft and obtained the bill of lading, they were not the owners of the beans and were powerless to direct and control the shipment to defendants at New Orleans. So also is it that if the consignment reached Chicago in due course; was promptly accepted by the plaintiff, and Galloway's sight draft duly honored, but, that the plaintiffs unduly and unnecessarily delayed the shipment from Chicago to New Orleans, so as to bring it beyond the period stipulated in the contract for the commencement of shipment, the plaintiffs cannot recover.

As stated the shipment was not made direct from Brighton to New Orleans; and the evidence reveals that it did not even go direct from Brighton to East St. Louis, to which point the beans were billed. The shipment evidently stopped at Chicago, which is about mid-way between Brighton and East St. Louis, and were shipped thence after a delay of many days to East St. Louis; but by whom and to whom is not shown. We say evidently stopped at Chicago and shipped thence to East St. Louis after many days, from the fact that, taking judicial cognizance of the distance between these several points, we find that Brighton is but 283 miles from Chicago by the Pere Marquette Road, and East St. Louis but 284 miles from Chicago & Alton Railroad; and from the additional fact, shown by the record, that the beans were reshipped at Chicago by the Chicago and Alton Railroad Company and hauled thence in car No. 11,951 belonging to said railroad company, which car was delivered to the Iron Mountain Road at

East St. Louis on the morning of October 3rd. There is not the slightest picture that there was any unusual delay, attributed to the fault of the railways companies, in the transportation of the beans from Brighton to Chicago over the Pere Marquette road, nor from Chicago to East St. Louis over the Chicago & Alton road, and yet it appears that if the beans were really shipped from Brighton on the 14th of September, it was not until *twenty days thereafter* that they reached East St. Louis. The run from Brighton to Chicago, a distance of 253 miles, ought not, surely, to have consumed but two or three days at the very lowest rate of steam travel for freight carriage; and the same for the run from Chicago to East St. Louis. This extraordinary delay has not been accounted for.

Whether a delivery date is stipulated in a contract for the sale of goods or not, good faith and fair dealing and the interest of commerce alike unite in requiring that he who stipulates to make the shipment by a certain date should see to it that, at least by no fault of his own, there is no unusual and unnecessary delay in the delivery. When the shipment is claimed to have been made within the period stipulated and an unusual delay has ensured in the delivery, the onas is on the shipper to show that the delay is not attributable to him. This the plaintiffs has not done in this case.

Plaintiffs seem to have had some idea that it was encumbent rpon them to show that the delay was not attributable to them and this burden they took upon themselves to the extent of showing that the reshipment at East St. Louis was not under their control and direction and that if any delay was occasioned there, it was attributable to the delivering and recovering lines. The evidence does not show any delay at East St. Louis; nor was there any reshipping in the sense, as the evidence tends to show, of transferring the sacks of beans from one car to another on different lines. This process, it is clearly shown, took place at Chicago, for as stated, the beans reached Chicago in car No. 389

by the Pere Marquette road; was taken thence and placed in car 11,951 of the C. & A. R. R. Co., which car was transferred at East St. Louis to the Iron Mountain road and was delivered in New Orleans by the Texas & Pacific Railroad. As to the transfer at Chicago, when and by whom made and the delay there and the cause or causes therefor, no evidence is offered. Indeed it is only *inferential* that the beans bought from Galloway were those originally intended to be shipped by plaintiff to defendants to fill the order. True it is that plaintiffs testify that the beans tendered were those ordered from Galloway, but where do they say that the order placed with Galloway was for the purpose of filling their contract with the defendants.

On plaintiffs own showing the first effort made by them to direct the beans to New Orleans, consigned to defendants, was when they shipped them from St. Louis. They have utterly failed to show that the beans were ever under their control, prior to the 3rd day of October, and if they were, that they were ever intended for, or were by them shipped to defendants. Plaintiffs' whole case impresses us very unfavorably. Their failure to at any time to advise defendants that they had shipped the beans; their failure to notify them that they had drawn for the price of the beans on the 14th of September, the date when their draft is dated, and before they had acquired the beans or could obtain the bill of lading therefor; the transmission of their draft only long afterwards (the 6th or 7th of October), and after the date of actual shipment, (Oct. 3); the alteration of the bill of lading from Oct. 3 to Sept. 14th so as to make it correspond with the date of their sight draft, the shipment of the beans on the 3rd of Oct. after the market had fallen; their silence as to the fact that the beans were acquired from Galloway for the original purpose of forwarding them under their contract; the unexplained delay in the carriage of the beans from Brighton to Chicago and thence to St. Louis; and their beclouding of the question of delay in transportation by showing that they did not re-ship at East St. Louis from one car of one road to another car of another road, when in point of fact

the reshipment occurred at Chicago where plaintiffs reside, are circumstances which greatly affect the verity of their claim.

Having rested their case on the evidence which shows no other shipment by them to defendants than that which took place at East St. Louis on the 3rd of October; that point is therefore considered as the place selected by them for the shipment, and Oct. 3rd as the date when the beans were first destained for defts. For these reasons it is ordered, adjudged and decreed that judgment appealed from be and the same is hereby avoided, reversed and set aside and that plaintiffs' suit be dismissed at their costs in both Courts.